**IN UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **WEST VIRGINIA UNIVERSITY HOSPITALS, INC.** )<br>1 Medical Center Drive )<br>Morgantown, WV 26506 )<br>)<br>**BERKELEY MEDICAL CENTER** )<br>2500 Hospital Drive )<br>Martinsburg, WV 25401 )<br>)<br>**REYNOLDS MEMORIAL HOSPITAL** )<br>800 Wheeling Avenue )<br>Glen Dale, WV 26038 )<br>)<br>**WETZEL COUNTY HOSPITAL** )<br>3 East Benjamin Drive )<br>New Martinsville, WV 26155 )<br>)<br>　　　　　Plaintiffs, )<br>)<br>　　v. )<br>)<br>**ROBERT F. KENNEDY, JR.,** In his Capacity as )<br>Secretary of the U.S. Department )<br>of Health and Human Services )<br>200 Independence Avenue, S.W. )<br>Washington, D.C. 20201 )<br>)<br>　　　　　Defendant. )<br>_____ ) | Case No. |

**<u>COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION
ON MEDICARE REIMBURSEMENT</u>**

This is a civil action brought to obtain judicial review of a final decision rendered by the

Provider Reimbursement Review Board (the "<u>PRRB</u>" or "<u>Board</u>"), acting as a component of the

United States Department of Health and Human Services ("<u>HHS</u>"). The determination for which

judicial review is hereby sought is the dismissal of PRRB Case No. 22-1216GC.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

**JURISDICTION AND VENUE**

1.      This action arises under Title XVIII of the Social Security Act, as amended 42 U.S.C. §§ 1395 *et. seq*. (hereinafter, the "Medicare Act", the "Act", or the "Medicare program") and 5 U.S.C. §§ 706 *et. seq*. (hereinafter, the "Administrative Procedure Act" or the "APA").

2.      The Medicare payment issue in this action pertains to how inpatient hospital days should be counted for purposes of calculating each of the Plaintiffs' (hereinafter, "Plaintiffs," "Providers," or "Plaintiff Providers") respective Medicare Disproportionate Share Hospital ("DSH") payments for their cost reports ending within calendar year ("CY") 2018 included in the subject Common Issue Related Party ("CIRP") Group.

3.      This Court has jurisdiction under 42 U.S.C. § 1395oo(f), and 28 U.S.C. § 1361. Venue lies in this judicial district pursuant to 42 U.S.C. § 1395oo(f), and 28 U.S.C. § 1391(e).

4.      Further, this Court has jurisdiction under 42 U.S.C. § 1395oo(f), 28 U.S.C. § 1331, and 28 U.S.C. § 1391(e) because:

    (a) Each Provider filed cost report(s) (for various fiscal year ends ("FYE"), *infra.*) as required by 42 U.S.C. § 1395oo(a);

    (b) Each Provider was dissatisfied with their respective fiscal intermediary's final determination, ". . . as to the amount of total program reimbursement due the provider . . . for the period covered by such report," as required by 42 U.S.C. § 1395oo(a)(1)(A)(i);

    (c) The aggregate amount in controversy for the subject CIRP Group exceeds $50,000, as required by 42 U.S.C. § 1395oo(b);

    (d) Each Provider was timely added to the CIRP Group appeal with the PRRB pursuant to 42 U.S.C. §1395oo(a)(3);

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

(e) The Board initially dismissed the Providers' CIRP Group appeal by notifying each Provider on August 13, 2025, that the appeal in which it was participating had been dismissed;

(f) The Providers submitted a written Request for Reconsideration of the Board's dismissal and Reinstatement of their CIRP Group appeal on October 13, 2025. The request to reconsider was essentially brushed aside by the Board ("The Board … declines to exercise its discretion…") in its letter issued on January 22, 2026, which notified each Provider that the Board was essentially upholding its decision to dismiss their CIRP Group appeal;

(g) In accordance with 42 U.S.C. § 1395oo(f)(1), this civil action is filed within sixty (60) days of the date that each Provider was notified by the PRRB in writing that (1) the Board refused to exercise it discretion to reinstate the Providers' appeal despite the Providers' good faith request for reconsideration and reinstatement; and (2) the initial dismissal of the appeal was thereupon unmodified despite Providers' request. This final determination was issued in the Board's letter dated January 22, 2026. (PRRB Dismissal for Untimely Filing letter and Determination re: Request for Reconsideration and Reinstatement letter are attached together hereto as **Exhibit A**).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

5.      Plaintiffs have exhausted all administrative remedies under federal law.

**PARTIES AND RELEVANT AGENCIES**

6.      Each Plaintiff herein is an acute care, in-patient healthcare facility that serves a disproportionate share of low-income patients. At all relevant times, each Plaintiff Provider had a Medicare provider agreement with the Secretary of HHS and was eligible to participate in the Medicare program. Per the "Schedule of Providers" (attached hereto as **Exhibit B**), this case is with respect to the four (4) Providers participating in the subject CIRP Group in PRRB Case No. 22-1216GC, with each such Provider appealing the same issue for CY 2018. (Ex. B at 2).

7.      Plaintiff WEST VIRGINIA UNIVERSITY HOSPITALS, INC. is located in Morgantown, WV 26506, Plaintiff BERKELEY MEDICAL CENTER is located in Martinsburg, WV 25401, Plaintiff REYNOLDS MEMORIAL HOSPITAL is located in Glen Dale, WV 26038, and Plaintiff WETZEL COUNTY HOSPITAL is located in New Martinsville, WV 26155.

8.      Defendant, Robert F. Kennedy Jr., Secretary of HHS (the "Secretary"), 200 Independence Avenue, S.W., Washington D.C. 20201, or his predecessors in office, is the federal officer responsible for the administration of the Medicare program. Defendant Kennedy is sued in his official capacity.

9.      The Centers for Medicare & Medicaid Services ("CMS") administers the Medicare program by delegation from, and as agent of, the Secretary.

10.     The Medicare Administrative Contractors ("MACs" or individually "MAC") are organizations that administer the Medicare program in a given area under contract with CMS pursuant to 42 U.S.C. § 1395h. For the Medicare group appeal at issue, the MAC designated as the CMS representative was Palmetto GBA c/o National Government Services, Inc. ("Palmetto").

11.     The PRRB is an agency of HHS and acts as an administrative hearing body for Medicare reimbursement disputes between providers of Medicare services and MACs pursuant to 42 U.S.C. § 1395oo.

12.     As set forth more fully below, Plaintiffs object to the dismissal and subsequent denial of reconsideration re: dismissal and reinstatement of their group appeal by the PRRB as arbitrary, capricious, and overly punitive. Moreover, through its actions, the Board clearly demonstrated its bad faith exercise of its discretion by dismissing Plaintiffs' group appeal.

## MEDICARE STATUTORY AND REGULATORY BACKGROUND

13.     Title XVIII of the Social Security Act, Pub. L. No. 89-97, 79 Stat. 291, as amended by 42 U.S.C. §§ 1395 et. seq. (hereinafter, the "Medicare program"), establishes a program of medical benefits for persons aged 65 or older, for persons under age 65 who are disabled, and for persons with end-stage renal disease. CMS, formerly the Health Care Financing Administration ("HCFA"), is the operating component of HHS charged with administering the Medicare program.

14.     Medicare reimburses the operating costs of short-term acute care hospital inpatient services primarily through the hospital Inpatient Prospective Payment System ("IPPS"). 42 U.S.C. § 1395ww(d). The IPPS Statute (the "Statute") contains several provisions that adjust reimbursements based on provider-specific factors. See 42 U.S.C. § 1395ww(d)(5). This case involves the provider-specific DSH adjustment, which requires the Secretary to provide increased IPPS reimbursement to providers that serve a "significantly disproportionate number of low-income patients." 42 U.S.C. § 1395ww(d)(5)(F)(i)(I).

15.     Whether a provider qualifies for the DSH adjustment, and how large an adjustment it receives, depends on the provider's "disproportionate patient percentage" ("DPP"). 42 U.S.C. § 1395ww(d)(5)(F)(v). The DPP is the sum of two fractions, the so-called "Medicare Fraction" and

the "Medicaid Fraction," for a provider's fiscal period. 42 U.S.C. § 1395ww(d)(5)(F)(vi). Providers whose DSH percentages meet certain thresholds receive an adjustment which results in increased IPPS payments for inpatient hospital services. 42 U.S.C. § 1395ww(d)(5)(F)(ii).

16.    The first fraction is the Medicare Fraction, also known as the "SSI Fraction." The Medicare Fraction's numerator is the number of a provider's inpatient days for such period who (for such days) were entitled to both Medicare Part A and Supplemental Security Income ("SSI") benefits, and the denominator is the number of patient days for patients entitled to Medicare Part A. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I). This case involves this first fraction - the Medicare Fraction.

17.    The second fraction is the Medicaid Fraction. The Medicaid Fraction's numerator is the number of a provider's inpatient days for patients who (for such days) were eligible for medical assistance under a State Plan approved under Title XIX of the Social Security Act, 42 U.S.C. § 1396-1 *et seq*., for such period but not entitled to benefits under Medicare Part A, and the denominator is the total number of the provider's inpatient days for such period. *Id*.

18.    The Statute provides that a provider's DPP shall be determined according to the provider's cost reporting period. 42 U.S.C. 1395ww(d)(5)(F)(vi) ("in this subparagraph, the term 'disproportionate patient percentage' means, with respect to a cost reporting period of a hospital..."). The Secretary is not permitted to change the underlying substantive standards used in processing the provider's original DPP, regardless of whether such change would be beneficial or detrimental to the provider.

19.    The DSH program was enacted by Congress in the Consolidated Omnibus Budget Reconciliation Act of 1985 and was made effective beginning with discharges on or after May 1, 1986. Pub. L. No. 99272, § 9105, 100 Stat. 158-60 (Apr. 7, 1986).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

20.    The Secretary implemented the DSH program through the publication of an interim final rule on May 6, 1986. 51 Fed. Reg. 16,772 (May 6, 1986). In the May 6, 1986 final rule, the Secretary decreed that only Medicare beneficiaries who are "recipients" of SSI, *i.e.*, only those Medicare beneficiaries who have *received* payment in a given month will have their inpatient hospital stay days counted in the numerator of the Medicare Fraction for that month. *Id.* at 16,777.

21.    In the August 16, 2010 final rule, the Secretary maintained that "our policy has always been to include only Medicare beneficiaries who are *entitled* to receive SSI benefits in the numerator of the SSI fraction." 75 Fed. Reg. 50,042, at 50,280 n.19 (Aug. 16, 2010). The Secretary's policy is that Medicare beneficiaries are deemed to be "*entitled*" to receive SSI benefits" for purposes of the DSH calculation only if they are in receipt of SSI cash benefits for a given month of his/her hospitalization for purposes of including the inpatient days associated with such beneficiaries in the numerator of the SSI Fraction.

22.    As noted above, the Medicare fraction is calculated by using: (a) in the numerator, the "number of such hospital's patient days...which were made up of patients who (for such days) were *entitled* to benefits under Medicare Part A and were *entitled* to supplemental security income benefits...under subchapter XVI of this chapter..."; and (b) in the denominator, the number of days of care that are furnished to patients who were *entitled* to Medicare Part A. (Emphasis added). The dispute in this case, therefore, involves the Providers' appeal of CMS's determination as to which patients are "*entitled to*" both Medicare Part A and SSI benefits for purposes of the Medicare fraction of the DSH calculation. 42 U.S.C. § 1395ww(d)(5)(F)(vi)(I); 42 C.F.R. § 412.106(b)(2)(i)(B).

23.     The Secretary does not consider beneficiaries who received non-cash SSI benefits for a particular month to be "entitled to receive SSI benefits." And as explained below, the Secretary's policy is to omit the inpatient days of certain Medicare beneficiaries who: (1) were entitled to be paid SSI for the month(s) of their hospital stay; and (2) at the time of a data match between the Social Security Administration and CMS, were known by SSA to be entitled to SSI payment for such month(s); but (3) had not actually received payment for such month(s) by the time the data match was performed.

24.     The SSI program is a federal cash assistance program for low-income individuals who are aged, blind, or disabled, 42 U.S.C. § 1382, and is administered by the Social Security Administration ("SSA"). The SSI statute does not use the term "entitled" to SSI benefits. Rather, the SSI statute typically refers to whether an individual is "eligible for benefits." 42 U.S.C. §§ 1381a, 1382(a). To be "eligible" for SSI benefits, a person must: (1) be 65 years of age or older, blind or disabled; (2) be a lawful resident of the United States; (3) have limited income and resources; (4) not be fleeing to avoid prosecution for a crime or violating a condition of parole; and (5) file an application for benefits. 20 C.F.R. § 416.202.

25.     To enable CMS to calculate the SSI Fraction, SSA sends CMS an annual "eligibility file" that includes information on all SSI recipients whom SSA has coded with one of three Payment Status Codes ("PSCs"): C01 (current pay), M01 (forced pay), and M02 (forced due). Although SSA has dozens of payment status codes, CMS's policy is that only C01, M01, and M02 will characterize a patient as "entitled to" SSI benefits for purposes of the numerator of the SSI Fraction. *See* 75 Fed. Reg. at 50,042, 50,280 (Aug. 16, 2010). Therefore, at CMS's explicit direction, only those individuals with one of the three above-referenced payment status codes are listed on the SSA annual "eligibility file."

26.    SSA does not include payment status codes in the SSI eligibility file but does include monthly indicators denoting which month(s) each person received SSI payments. *See id.* at 50,276; *see also* 51 Fed. Reg. 31,454, 31,459 (Sept. 3, 1986) (stating that the SSI file "lists all SSI recipients for a 3-year period and denotes the months during that period in which the recipient was eligible for SSI benefits").

27.    CMS then computes the SSI Fraction by matching individuals appearing in the SSA's eligibility file with its own Medicare inpatient data to identify a patient's entitlement to SSI benefits. *See,* 75 Fed. Reg. at 50,281 (Aug. 16, 2010). In other words, "CMS identifies the individuals appearing in both two data sets to determine the number of patients, and the inpatient days for those patients at each hospital, for the applicable fiscal year to calculate the hospital's SSI numerator." *Id*.

28.    The data match between SSA and CMS for any given federal fiscal year ("FFY") is conducted approximately  15 months after the end of that fiscal year ("FY"). If, at the time the data match  is performed, a Medicare beneficiary was paid SSI cash benefits for a month covered by the data  match, any inpatient hospital days associated with such beneficiary will be counted in the numerator of the Medicare Fraction. For example, if Medicare Beneficiary is an inpatient  in Hospital (a Medicare certified short-term acute care hospital) from April 29-May 6, 2022 and, by the time the SSA eligibility file is constructed for that year, was paid SSI for April but not for May, the days April 29-30 would be counted in the numerator of the Medicare Fraction, and the days May 1-6 would not be counted.

29.    After the SSA-CMS data match is performed, CMS does not adjust the Medicare Fraction based upon subsequent, retroactive corrections to the eligibility status of a Medicare beneficiary. Thus,  for example, if Medicare Beneficiary filed an application for SSI based on

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

disability on January 1, 2023, and had an inpatient stay in July 2023, but was not, at the time of her stay, adjudicated eligible for SSI, then Medicare Beneficiary would not appear on the SSA eligibility tape, and thus the days associated with her July 2023 stay would not be counted in the numerator of Hospital's Medicare Fraction. Moreover, if, six months after the data match for Fiscal Year 2023 was performed, Medicare Beneficiary was awarded SSI based on disability retroactive to January 1, 2023, the days associated with Medicare Beneficiary's July 2023 stay nevertheless would not be added to the numerator of Hospital's Medicare Fraction. In this example, at the time the data match was performed, neither SSA nor CMS knew that Medicare Beneficiary would subsequently be awarded SSI based on disability.

30.    However, in contrast to the example given in the previous paragraph, there are situations in which (a) a Medicare beneficiary does not receive an SSI payment for a particular month, (b) is entitled to an SSI payment for that month, and, at the time of the data match, is known by SSA to be so entitled, but (c) inpatient days associated with such individual nevertheless are not counted. For example, if, for a given month, an individual does not have a bank account or is considered by SSA to need a representative payee, but no payee has yet been designated, or SSA does not have a valid address for such an individual, SSA will not make payment to that individual for that month. If the administrative reason for not making payment is not resolved by the time the SSI eligibility file is constructed, the inpatient days associated with such beneficiary will not be included in the numerator of the Medicare Fraction because CMS requests or directs SSA to include only individuals with payment status codes C01, M01, or M02. This, despite the fact that SSA has any number of unused PSC's that would denote a Medicare beneficiary who is otherwise due an SSA cash payment for a given month but did not "receive" that payment solely because

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

SSA did not then have a current, valid address for that beneficiary (i.e., Payment Status Code S06, currently not utilized by SSA for its annual "eligibility file").

31.    SSA's Programs Operating Manual System ("POMS") is sub-regulatory guidance published by and used by SSA to implement the SSI program. Section SI 02301.201 of the POMS is entitled "Description of SSI Post-eligibility (PE) Events." It states in the Introduction portion that "[t]he term 'eligible' in this subchapter means that a recipient meets all eligibility requirements for part or all of a past or current month(s)." Section SI 02301.201B.2. is entitled "Stop Payment." It explains that "[a] stop payment is an interruption in payment. It is not a loss of eligibility. Payments may be reinstated for past or current month(s) on a stop pay record regardless of the period in non-pay." Section SI 02301.201B.2. specifically mentions the situation in which an SSI eligible individual needs a representative payee, but the SSA field office has not appointed one as a "stop payment."

32.    Under the Secretary's policy, not all individuals who are entitled to SSI have their inpatient days included in the Medicare Fraction during the month(s) of their hospital stay, either because they are entitled to SSI but were not entitled to SSI cash payments during such month(s), or were entitled to SSI cash payments but were not paid SSI cash payments for such month(s).

33.    CMS's payment and audit functions under the Medicare program are contracted out to MACs. MACs determine payment amounts due to the providers under Medicare law and regulations. 42 U.S.C. § 1395h, 42 C.F.R. §§ 413.20(b) and 413.24(b). Although the MAC calculates the DPP, CMS computes the SSI fraction.

34.    At the close of its FY, a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. § 413.20. The MAC reviews the cost report, determines the total amount of Medicare

reimbursement due to the provider and issues the provider a Notice of Program Reimbursement ("NPR").

## CMS FINAL RULE 1498-R

35.     Consistent with Ruling 1498-R (April 28, 2010), CMS published a new data matching process in the FY 2011 proposed rule published on May 4, 2010, (75 Fed. Reg. 23,852, 24,002-24,007 (May 4, 2010)) and finalized that data matching process in the final rule published on August 16, 2010 ("FY 2011 Final Rule"). 75 Fed. Reg. 50,041, 50,280-50,281 (Aug. 16, 2010).

36.     In the preamble discussion to the FY 2011 Final Rule, CMS acknowledged a public comment that: (1) requested that "CMS include both paid and unpaid days for both SSI entitlement and Medicare entitlement such that there would be consistency between the numerator and denominator of the SSI fraction;" and (2) provided examples of "several SSI codes that represent individuals who were eligible for SSI but not eligible for SSI payments, that should be included as SSI-entitled for purposes of the data match process." *Id*. at 50,280. CMS responded in detail to this comment and explained that CMS interprets SSI entitlement to correspond with any month for which an individual *receives* payment of SSI benefits.

37.     In this regard, CMS stated that the inclusion of the three SSI codes denoted as C01, M01, and M02 "accurately captures all SSI-entitled individuals during the month(s) they are entitled to receive SSI benefits". *Id.* at 50,280-50,281. CMS explicitly rejected the inclusion of other SSA codes because "SSI entitlement can change from time to time" and none of these codes "would be used to describe an individual who was entitled to receive SSI benefits during the month that one of these codes was used." *Id.* Of course, Plaintiffs herein strongly disagree with CMS's self-serving assessment. As did several commenters, who requested inclusion of codes such as S06, *supra* (suspended payment because the recipient's whereabouts are unknown based on an

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

undelivered check). And yet despite the common sense basis for such requests, CMS dogmatically refused to utilize any such unused codes despite the undeniable fact that such codes are assigned to individuals who were **clearly entitled** to an SSI payment for a given month. Finally, in the preamble, CMS confirms that "[t]he same data matching process [used for FY 2011 and beyond] will be used to calculate SSI fractions for cost reporting periods covered under the Ruling [1498-R]." *Id*. at 50,285.

### THE RELEVANT MEDICARE APPEALS PROCESS

38.     At the close of its fiscal year, a provider must submit a cost report to the MAC showing the costs it incurred during the fiscal year and the portion of those costs to be allocated to Medicare. 42 C.F.R. § 413.20. Under the Medicare program, each hospital's MAC is required to analyze and audit the hospital's annually submitted Medicare cost report and issue a Medicare NPR, which informs the hospital of the final determination of its total Medicare reimbursement for the hospital's fiscal year. 42 C.F.R. § 405.1803. In addition to including costs on its cost report, a hospital is also required to make a claim, or alternatively self-disallow, for any adjustment to its basic IPPS payment adjustment, such as the DSH adjustment. 42 C.F.R. § 413.24(j).

39.     If a hospital is dissatisfied with its MAC's final determination (or any revised final determination) of the hospital's total Medicare program reimbursement for a fiscal year, as reflected in the NPR, and the hospital satisfies the amount in controversy requirements, the hospital has a right to obtain a hearing before the Board by filing an appeal within 180 days of receiving its NPR (or any revised NPR). 42 U.S.C. § 1395oo(a); 42 C.F.R. § 405.1835(a). In addition to having the authority to make substantive decisions concerning Medicare reimbursement appeals, the Board is authorized to decide questions relating to its jurisdiction and procedure. *See* 42 U.S.C. § 1395oo. Further, the Board is required to "affirm, modify, or reverse . . . **and** to make any other

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

revisions on matters covered by such cost report[.]" *See* 42 U.S.C. § 1395oo(d) (emphasis added). That is, the Board cannot avoid making necessary revisions on matters properly before it.

40. The decision of the Board on substantive or jurisdictional issues constitutes final administrative action unless the Secretary reverses, affirms, or modifies the decision within 60 days of the hospital's notification of the Board's decision. 42 U.S.C. § 1395oo(f)(1); 42 C.F.R. §§ 405.1875, 405.1877. The Secretary has delegated its authority under the statute to review the Board decisions to the CMS Administrator. *See* 42 C.F.R. §§ 405.1875, 405.1877. Thus, the Secretary's final administrative decision for purposes of judicial review is either the decision of the Board or the decision of the CMS Administrator after reviewing the Board's decision. *See* 42 C.F.R. § 405.1877(a)(2).

41. A hospital may obtain judicial review by filing suit within 60 days of receipt of the Secretary's final administrative decision in the United States District Court for the judicial district in which the hospital is located or in the United States District Court for the District of Columbia. 42 U.S.C. § 1395oo(f)(1). The date of receipt of such a decision is presumed to be five (5) days after the date of issuance. *See* 42 C.F.R. § 405.1801(a)(1)(iii). The Secretary is the proper defendant in such an action. *See* 42 C.F.R. § 405.1877(a)(2). Under 42 U.S.C. § 1395oo(f)(2), interest is to be awarded in favor of the prevailing party in an action brought under 42 U.S.C. § 1395oo(f). Under 42 U.S.C. § 1395g(d), CMS is required to pay interest on underpayments to Medicare providers, if the underpayment is not paid within thirty days of a "final determination."

## APPLICABILITY OF THE APA TO MEDICARE APPEALS

42. Under 42 U.S.C. § 1395oo(f)(1), an action brought for judicial review of final agency action involving PRRB appeals "shall be tried pursuant to the applicable provisions under chapter 7 of title 5 of the U.S. Code, which contains the Administrative Procedure Act (APA).

Under the APA, a "reviewing court shall . . . hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

## FACTS SPECIFIC TO THIS MATTER

43.     It is acknowledged by the PRRB that it received Plaintiffs' CIRP Group Appeal Request. The subject of the CIRP group appeal was described as, "Disproportionate Share Hospital Payment – Dual Eligible Days (Exhausted Part A Benefit Days, Medicare Secondary Payor Days, and No-Pay Part A Days, Eligible SSI Days for Which No Payment Was Made) - (SSI Fraction)." (Plaintiffs' issue statement attached as **Exhibit C at 2**).

44.     In Plaintiffs' appeal, Plaintiffs disputed:

> …CMS's policy of excluding unpaid SSI days from the numerator of the Medicare fraction. Despite CMS's seemingly contrary policy of treating unpaid Part A days as days entitled to benefits under Part A, CMS requires that a beneficiary be paid SSI benefits (or 'covered' by SSI) during the period of his or her hospital stay in order for such days to be considered 'entitled to supplemental security income benefits' and included in the numerator of the SSI fraction. However, per POMS SI 02005.001 eligibility and payment computations related to the SSI program are generally based upon income from different months. The Provider[s] seek[] to have the eligibility and payment computations related to the SSI program based upon the same month.

*Id.*

45.     On July 28, 2023, and pursuant to 42 C.F.R. § 405.1837(e)(1), Plaintiffs' Group representative, Quality Reimbursement Services, Inc. ("QRS"), timely responded to the Board's request for the current status of Providers' CIRP Group formation (response attached as **Exhibit D**) by requesting that the subject CIRP Group appeal remain "open" pending the issuance of NPRs for two additional providers which had yet to receive NPRs for the issue under appeal.

46.     On July 9, 2025, and before those two providers identified in QRS's July 28, 2023 response letter were formally added to the CIRP Group appeal, the Board issued a CIRP Group Status Request (attached as **Exhibit E**). The Board requested that QRS advise it "…on the status of the case, including: (1) whether the providers are still pursuing this group issue; (2) whether this group is fully formed based on the existing group participants; and (3) if the group is not complete, identify which providers have not yet received a final determination for the specified fiscal year." (Ex. E at 2).

47.     QRS inadvertently missed the Board's deadline of August 8, 2025 for a response, whereupon just five days later, the Board proceeded to dismiss the CIRP Group appeal.  Following the Board's dismissal, QRS filed a Motion for Reconsideration and Reinstatement ("MTR") (attached as **Exhibit F**), seeking to reason with the Board and asserting that " the Board's remedy should have been to deem the CIRP Group as then-constituted complete (i.e., deem the CIRP as presently constituted "closed" to further participants) and move forward with the Group's current Participants. In view of the fact that several new Group Participants were added following the Group's *Comments Regarding Full Formation of Group* response letter dated July 28, 2023, coupled with the sound rationale that no prejudice to the Board nor the MAC would be sustained should that rather effortless alternative solution proffered in its Motion be chosen, QRS contended that such a remedy would be far more just and equitable towards one's inadvertent administrative mistake, i.e., not timely responding to a Board status request letter when compared to the Board's current remedy which amounted to a death-knell dismissal (*See* Ex. F at 2).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

48.     The Board denied QRS's MTR, reaffirming its position in its initial dismissal, additionally stating that Plaintiffs' "…***Reconsideration Request***, filed 60 days after the 'final Board decision,' does not give the Provider an additional 60 days to file an appeal of the decision, which it seemingly failed to appeal in a timely manner." (Ex. A at 6).

49.     Plaintiffs contend that although the Board does retain ***discretionary*** authority, the Board's rationale for, and actions preceding, its initial dismissal reflect the Board's arbitrary, capricious, and overly punitive nature by upholding its dismissal of the appeal while denying Plaintiffs' MTR. Furthermore, the two Group providers and FYEs that were listed in Plaintiffs' Comments Regarding Full Formation of the Group (Ex. D) had not, and could not yet have been formally added to the Group Appeal as each had not yet been issued the requisite NPR by the MAC. The Board is keenly aware that NPRs for many providers who are under common ownership and potentially eligible to join a CIRP Group (i.e., common issues and the same fiscal year) are often issued *several* years after other fellow CIRP providers have already received their NPRs. These two facts substantiate and amplify the arbitrary and capricious nature of the Board's dismissal and ultimate denial of reinstatement.

50.     Moreover, Plaintiffs filed their MTR which was subsequently denied by the Board. Despite the Board's stance to the contrary, this denial must be construed as constituting the 'final decision' and thus available for judicial review under 42 C.F.R. § 405.1877 as it constituted the Board's refusal to modify (i.e., "declines to exercise its discretion… ") its initial dismissal of Plaintiffs' CIRP Group appeal. The Board's statement refuting this rationale lends further soundness to Plaintiffs' contention towards the arbitrary and capricious manner in which the Board conducted itself throughout the duration of Plaintiffs' appeal. (*See* Ex. A at 7).

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

## COUNT I

**Judicial Review Under the Medicare Act and the APA**
**(The Board's Dismissal and Denial of Reinstatement of the CIRP Group appeal was**
**Arbitrary, Capricious, an Abuse of Discretion, and Otherwise Contrary to Law)**

51.     Plaintiff Hospitals incorporate by reference paragraphs 1-50 of this Complaint.

52.     The APA prohibits agency action that is "…arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law;" 5 U.S.C. § 706(2)(A).

53.     The Board's dismissal of Plaintiffs' CIRP Group appeal was arbitrary, capricious, an abuse of discretion, and otherwise contrary to the Medicare Act.

## REQUEST FOR RELIEF

**WHEREFORE**, Plaintiffs respectfully requests for an Order:

(a)     Reversing and setting aside the PRRB decision of dismissal and denial of reinstatement of the Plaintiffs' appeal.

(b)     Remanding the appeal back to the Board for full adjudication on the merits;

(c)     Awarding the costs of suit incurred by Plaintiffs;

(d)     Awarding Plaintiffs interest as required by 42 U.S.C. § 1395oo(f)(2); and,

(e)     For such other and further relief as the Court may deem just and proper under the circumstances.

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT

Dated:  March 23, 2026

Respectfully submitted,

By:  */s/ Alan J. Sedley*___
ALAN J. SEDLEY  (Bar No. OH0017)
ALAN J. SEDLEY LAW CORP.
18880 Douglas, Suite 417
Irvine, CA 92612
(818) 601-0098
sedley@sedleyhealthlaw.com

*Attorney for Plaintiffs*

COMPLAINT FOR JUDICIAL REVIEW OF FINAL ADVERSE AGENCY DECISION ON MEDICARE REIMBURSEMENT